**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| **SPECTRUM ASSOCIATION** | § | |
| **MANAGEMENT OF TEXAS, LLC** | § | |
| *Plaintiff,* | § | |
| | § | **CIVIL ACTION NO. 5:18-cv-00940-ADA** |
| **v.** | § | |
| | § | |
| **LIFETIME HOA MANAGEMENT, LLC** | § | |
| **and JAY TUTTLE,** | § | |
| *Defendants.* | § | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

### I.        INTRODUCTION

1.        On February 4, 2020, the Court conducted a bench trial of this matter (Dkt. No. 54). At trial, two witnesses testified, Spectrum employee Samantha Thomas and Defendant and Lifetime HOA Management, LLC ("Lifetime") partner Jay Tuttle (Dkt. No. 53). Additionally, the Court admitted excerpts of the deposition testimony of David Housley, Ray Sauceda, and Spencer Powell (Dkt. 43-2, Trial Tr. p. 151). The Court also admitted exhibits P-1 through P-16 (Trial Tr. p. 18-19, 29). Upon the conclusion of trial, the Court took the case under advisement and asked the parties to each submit competing proposed findings of fact and conclusions of law (Trial Tr. p. 178). On April 10, 2020, the parties submitted final proposed findings of fact and conclusions of law. ECF Nos. 59, 60.

### II.        FACTUAL FINDINGS

2.        Spectrum provides community-association management services to homeowners associations in San Antonio and other areas in Texas (Trial Tr. 17:11-14, 61:18-21).

3.        Spectrum offers its community-association management services under its federally registered trademarks SPECTRUM ASSOCIATION MANAGEMENT, MAKING A

DIFFERENCE SPECTRUM ASSOCIATION MANAGEMENT, LP, and SPECTRUM ASSOCIATION MANAGEMENT, LP (collectively, the "Marks") (Ex. P-1 – P4; Trial Tr. 19:15-18).

4.      Spectrum has exclusive rights in the Marks pursuant to a Trademark License Agreement (Ex. P-5; Trial Tr. 19:19-25; 20:7-14).

5.      The Marks represent the goods and services offered by Spectrum and/or its affiliates and/or licensees, and due to the extensive use and registration of the Marks, the Marks have become well known in the greater San Antonio community-association management market (Trial Tr. 17:15-18:2; 20:15-21:12-20; 61:25-63:6).

6.      From 2012 through the present, Spectrum had an active trademark that included the name Spectrum Association Management (Trial Tr. 54:10-55:7; Ex. P-1 – P4).

7.      Spectrum used the Marks in commerce in conjunction with its "spectrumam.com" domain name since May 2004 (Trial Tr. 21:2-20).

8.      Defendant Jay Tuttle ("Tuttle") began working at Spectrum in 2012, and was Spectrum's Director of Business Development beginning in late 2012 (Trial Tr. 21:21-22:3; 63:7-21).

9.      Tuttle had no experience with association management services, other than personal experience he may have had living in an association management community. Spectrum provided Tuttle his training in the association management business (Trial Tr. 22:4-15; 107:25-108:7).

10.     As Spectrum's Director of Business Development, Tuttle was aware and familiar with the Marks and Spectrum's domain name (Trial Tr. 22:23-23:21; 64:22-65:6; 65:15-66:6; 66:13-17).

11.     Tuttle left Spectrum in April 2015 (Trial Tr. 22:16-18; 66:18-19).

12.     Tuttle's employment contract included a non-compete provision that prohibited him from competing with Spectrum for a period of one year, which expired sometime in April 2016 (Trial Tr. 22:16-22; 67:2-17).

13.     Defendant Lifetime HOA Management, LLC ("Lifetime"), which also provides community-association management services to homeowner's associations in the San Antonio area, was formed in February 2016 (Dkt. 43-2, Housley Excerpt p. 10:6-13; Trial Tr. 67:18-19).

14.     Tuttle was heavily involved in Lifetime after leaving Spectrum, spending a few hours a week providing free consulting to Lifetime, including participation in partnership meetings, providing advice concerning Lifetime's provision of community-association management services, and providing advice on the structure of how to sell community-association management services (Dkt. 43-2, Powell Excerpts at p. 12:13-13:19, 15:2-16:23, 42:24-43:25, 52:13-22, 53:1-18, 60:22-61:5; Trial Tr. 68:20-69:15; 70:12-71:1).

15.     None of Lifetime's other partners had any previous experience running a community association management company, and they relied on Tuttle for advice (Dkt. 43-2, Housley Excerpts at p. 10:14-11:19, Powell Excerpts at p. 82:19-83:3; Trial Tr. 69:16-71:1).

16.     Spencer Powell, a former partner in Lifetime, understood Tuttle to have always been a Lifetime partner and the delay in Tuttle's "technical" partnership was to avoid any issues with his non-compete with Spectrum (Dkt. No. 43-2, Powell Excerpts at p. 15:2-16:23, 17:15-22).

17.     Tuttle provided leads to Powell and set up sales meetings for Powell, including participating in a sales pitch with Powell for Meritage Homes in October 2016, which was a

customer of Spectrum at the time (Dkt. No. 43-2, Powell Excerpts at p. 20:1-21:8, 38:19-22, 55:11-25, 59:13-16).

18.     Lifetime competes with Spectrum to provide community-association management services in the San Antonio area (Dkt. No. 43-2, Housley Excerpts at p. 45:13-19, Powell Excerpts at p. 54:9-21, Saucedo Excerpts at p. 22:18-21; Trial Tr. 71:19-72:8).

19.     On May 19, 2016, Tuttle registered the domain name "Spectrumhoamanagment.com" (the "Infringing Domain") with GoDaddy.com on behalf of Lifetime (Dkt. No. 43-2, Housley Excerpts at p. 24:24-25:1; Ex. P-7; Trial Tr. 73:1-13).

20.     Tuttle was the registrant of record of "Spectrumhoamanagment.com" on the date Spectrum filed its Complaint (Ex. P-6 –P-7; Trial Tr. 30:17-19).

21.     Although Tuttle was allegedly not a Lifetime partner, Tuttle attended meetings of the partners and purchased the Infringing Domain and Lifetime's own domain because he was the only person with a computer and GoDaddy account at the partners' meeting (Trial Tr. 136:2-137:10).

22.     Lifetime reimbursed Tuttle for the purchase of the Infringing Domain (Trial Tr. 73:14-16).

23.     Although Tuttle was reimbursed for the purchase of the Infringing Domain, the Infringing Domain was never transferred into Lifetime's name and was renewed annually through Tuttle's GoDaddy account (Trial Tr. 93:23-94:9).

24.     Defendants obtained the Infringing Domain because it used Spectrum's name and Spectrum offered the same type of HOA management services offered by Lifetime (Dkt. No. 43-2, Housley Excerpts at p. 35:24-36:18; Trial Tr. 74:7-75:5).

4

25.     At the time Tuttle purchased the Infringing Domain, Spectrum was a more well-known name than Lifetime due to Spectrum's provision of HOA management services for a number of years in comparison to Lifetime, which had just been formed (Trial Tr. 75:6-14).

26.     Additionally, David Housley testified that Lifetime purchased the Infringing Domain because he saw value in it and Lifetime could perhaps sell it to Spectrum at a later date (Dkt. No. 43-2, Housley Excerpts at p. 36:7-18).

27.     Neither Tuttle nor Lifetime sought the advice of counsel before buying the Infringing Domain that used a competitor and former employers' name (Trial Tr. 76:5-7).

28.     At the time Tuttle registered the Infringing Domain, Defendants initiated an option on GoDaddy that forwarded anyone that typed the Infringing Domain into a web browser to Lifetime's website, www.lifetimehoamanagement.com, which Lifetime used for the purpose of marketing its community-association management services (Ex. P-16; Dkt. No. 43-2, Housley Excerpts at p. 38:14-39:8, 41:12-42:10, Powell Excerpts at p. 62:22-63:16; Trial Tr. 76:8-77:2; 80:5-19, 86:4-18).

29.     Defendants' purpose for setting up the forwarding mechanism was to direct people who typed in the Infringing Domain, in an attempt to find Spectrum's website, to Lifetime's website (Dkt. No. 43-2, Powell Excerpts at p. 96:25-97:11, 98:17-20; Trial Tr. 76:15-77:2).

30.     Lifetime received leads from its website that may have eventually became Lifetime customers (Dkt. No. 43-2, Powell Excerpts at p. 37:3-38:9, 39:5-41:17, 41:23-42:21; Saucedo Excerpts at p. 16:7-21, 21:6-22:11, 57:13-58:12, 45:2-17, 67:9-16; Trial Tr. 86:20-22).

31.     The Infringing Domain uses the Mark's, which only Spectrum retains the exclusive right to use in commerce (Ex. P-1 – P-7; Trial Tr. 20:7-14).

32.     The Infringing Domain also uses Spectrum's legal name or a name that is otherwise commonly used to identify Spectrum (Ex. P-1 to P-7; Dkt. No. 43-2, Powell Excerpts at p. 33:9-12; Trial Tr. 27:7-24; 74:7-75:5).

33.     David Housley testified about the process Defendants used for finding the Infringing Domain:

```
 2          Q.  Can you, then, kind of walk me through the
 3   process of how you search for available domain names?
 4          A.  Go to GoDaddy, type in a URL.
 5          Q.  So it's not just a matter of typing in HOA
 6   management and it shows you all the HOA managements that
 7   are available.  You'd need to actually type in the URL
 8   you were thinking of using?
 9          A.  That's how I've done it.
10          Q.  So someone, whether it was you or Mr. Tuttle,
11   specifically looked to see if Spectrum HOA Management
12   was available.
13          A.  Correct.
```

(Dkt. No. 43-2, Housley Excerpts at p. 28:2-13).

34.     The Infringing Domain was the only domain purchased by Lifetime using a competitor's name (Dkt. No. 43-2, Housley Excerpts at p. 27:1-12; 28:14-19; Trial Tr. 85:9-13).

35.     When Tuttle registered the Infringing Domain, Defendants knew Spectrum was the owner of the Marks and that Defendants did not have any rights to the Marks (Dkt. No. 43-2, Housley Excerpts at pp 35:24-36:18; Trial Tr. 91:12-92:24).

36.     Neither Tuttle nor Lifetime previously used the Marks (Trial Tr. 92:25-93:3).

37.    Lifetime does not use "Spectrum" in its own website or in connection with any bona fide offering of Lifetime's association-management services (Dkt. No. 43-2, Powell Excerpts at p. 36:4-8; Trial Tr. 93:4-9).

38.    At that time of the Infringing Domain's registration, Tuttle also knew of the existence of the "spectrumam.com" domain name and that Spectrum used the Marks in promotion of its community-association management services (Trial Tr. 20:22-21:1; 23:4-21; 66:13-17).

39.    Tuttle also knew the Marks represented the goods and services offered by Spectrum (Trial Tr. 64:22-65:6, 65:15-66:6, 66:13-17).

40.    Prior to registering the Infringing Domain, Defendants did not use Spectrum's tradename or Marks in connection with the bona fide offering of any goods or services (Trial Tr. 92:25-93:9).

41.    Defendants do not have, and never had, Spectrum's consent to use the Marks for any reason, including for commercial use (Trial Tr. 20:7-14; 93:10-12).

42.    At the time Defendants registered the Infringing Domain, Defendants knew that they did not have any intellectual property rights in the Marks (Dkt. No. 43-2, Housley Excerpts at p. 35:24-36:18; Trial Tr. 92:9-93:12).

43.    At the time Defendants registered the Infringing Domain, Defendants knew that the Infringing Domain was confusingly similar to the Marks and Spectrum's domain name (Dkt. No. 43-2, Powell Excerpts at p. 33:9-12; Trial Tr. 74:12-75:5; 76:8-77:2; 93:13-17).

44.    At the time Defendants registered the Infringing Domain, Defendants did so with the intent to confuse Spectrum's customers or consumers seeking out Spectrum's association-

management services by intentionally diverting those individuals to Lifetime's website offering substantially similar services (Trial Tr. 74:12-75:5; 76:8-77:2; 132:13-133:16).

45.     Tuttle admitted that he and Lifetime's actions could harm Spectrum. (Trial Tr. 132:13-133:16).

46.     Tuttle became a named partner (or member) of Lifetime in October or November 2016, well after he registered the Infringing Domain (Trial Tr. 135:3-15).

47.     Spectrum discovered the Infringing Domain in 2018 when its marketing department was looking to purchase domains using Spectrum's Marks (Trial Tr. 27:2-6). The marketing department created a video of the forwarding of the Infringing Domain to Lifetime's website before Defendants' stopped the forwarding after the filing of the lawsuit (Ex. P-16; Trial Tr. 28:8-30:13).

48.     After discovering the Infringing Domain and its forwarding to Lifetime's website, Spectrum engaged counsel to move forward with litigation because Lifetime was a competitor that had already obtained a number of Spectrum clients (Trial Tr. 30:25-31:5).

49.     Lifetime did not maintain any records of how many times the Infringing Domain was accessed during the relevant time and only produced documents showing tracking information with a date range of July 2018 to January 2019 (the majority of that time occurred after the forwarding of the Infringing Domain was shut down) (Ex. P-11 to P-12; Dkt. No. 43-2, Housley Excerpts at p. 59:16-60:21; Trial Tr. 58:2-12, 94:21-95:10).

50.     Lifetime took little action to preserve any evidence after the lawsuit was filed (Dkt. No. 43-2, Housley Excerpts at p. 44:16-25; Trial Tr. 90:3-91:11; 131:19-132:12).

51.     Additionally, Defendants provided inconsistent and misleading responses to written discovery, including not admitting that Spectrum was a competitor, failing to identify a

number of clients it obtained from Spectrum, and representing that it had conducted a diligent search and determined the Infringing Domain had only been accessed six times when the diligent search consisted of asking each of Lifetime's partners how many times they had accessed the Infringing Domain (Ex. P-10, P-13 to P-15; Dkt. No. 43-2, Saucedo Excerpts at p. 23:13-24, 24:10-26:13; Trial Tr. 33:22-36:2; 96:6-98:9; 100:7-102:9).

52.     During the relevant time period, Spectrum lost twelve clients to Lifetime but Defendants failed to preserve or provide any records that would have assisted Spectrum determining whether any of those twelve associations had been forwarded to Lifetime through the Infringing Domain or whether Spectrum lost any potential clients to Lifetime as a result of the Infringing Domain (Ex. P-15; Dkt. No. 43-2, Housley Excerpts at p. 44:16-25; Saucedo Excerpts at p. 26:19-27:16, 29:21-32:9, 45:2-17; Trial Tr. 24:7-17; 100:7-101:5).

53.     Spectrum is aware of at least one potential client, Silver Oaks HOA, which accessed the Infringing Domain seeking to find Spectrum (Trial Tr. 55:8-16).

### III.   CONCLUSIONS OF LAW

**Violation of the ACPA**

54.     A person shall be liable in a civil action by the owner of a mark ... if, without regard to the goods or services of the parties, that person - -

> (i) has a bad faith intent to profit from that mark ...; and
>
> (ii) registers, traffics in, or uses a domain name that - -
>
> > (I) in the case of a mark that is distinctive at the time of registration of the domain name, is identical or confusingly similar to that mark.

15 U.S.C. § 1125(d).

55.     As registered marks, the Marks are "presumed to be distinctive and should be afforded the utmost protection." *E. & J. Gallo Winery v. Spider Webs, Ltd.*, 129 F.Supp. 2d.

1033, 1038 (S.D. Tex. 2001) *affr'm E. & J. Gallo Winery v. Spider Webs, Ltd.*, 286 F.3d 270, 278 (5th Cir. 2002).

56.     "Current registration of a trademark is 'conclusive evidence of the validity of the registered mark and of the registration of the mark, of the registrant's ownership of the mark, and of the registrant's exclusive right to use the registered mark in commerce.'" *Id. citing* 15 U.S.C. § 1115(b).

57.     The Infringing Domain uses the Marks, which only Spectrum retains the exclusive right to use in commerce (Ex. P-1 to P-5; Trial Tr. 20:7-14).

58.     The ACPA lists nine nonexclusive factors for courts to consider in determining whether a domain name has been registered or used in bad faith. The ACPA bad faith factors are:

> 1) the trademark or other intellectual property rights of the registrant, if any, in the domain name;
>
> 2) the extent to which the domain name consists of the legal name of the person or a name that is otherwise commonly used to identify that person;
>
> 3) the person's prior use, if any, of the domain name in connection with the bona fide offering of any goods or services;
>
> 4) the person's bona fide noncommercial or fair use of the mark in a site accessible under the domain name;
>
> 5) the person's intent to divert consumers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark;
>
> 6) the person's offer to transfer, sell, or otherwise assign the domain name to the mark owner or any third party for financial gain without having used, or having intent to use, the domain name in the bona fide offering of any goods or services or the person's prior conduct indicating a pattern of such conduct;
>
> 7) the person's provision of material and misleading false contact information when applying for the registration of the domain name, the person's intentional failure to maintain accurate contact information, or the person's prior conduct indicating a pattern of such conduct;

> 8) the person's registration or acquisition of multiple domain names that the person knows are identical or confusingly similar to the distinctive marks of others or are dilutive of the famous marks of others; and
>
> 9) the extent to which the mark incorporated in the domain name is distinctive and famous within the meaning of the Federal Trademark Dilution Act.

*See* 15 U.S.C. § 1125(d)(l)(B)(i); *see also Pet Silk, Inc. v. Jackson*, 481 F. Supp. 2d. 824, 832 n.

21 (S.D. Tex. 2007)

59.     Based upon the above findings of fact, factors 1-5 support a finding that Defendants acted with a bad faith intent to profit from Spectrum's Marks, including:

- At the time Defendants registered the Infringing Domain, Defendants knew that they did not have any intellectual property rights in the Marks or the domain name (Dkt. No. 43-2, Housley Excerpts at p. 35:24-36:18; Trial Tr. 92:9-93:12).

- The Infringing Domain name, "Spectrumhoamanagment.com", consists of Spectrum's legal name or a name that is otherwise commonly used to identify Spectrum (Ex. P-1 to P-4; Trial Tr. 27:7-24; 74:7-75:5).

- Lifetime did not and does not use "Spectrum" in its own website or in connection with any bona fide offering of Lifetime's association-management services (Dkt. No. 43-2, Powell Excerpts at p. 36:4-8; Trial Tr. 92:25-93:9).

- Defendants registered the Infringing Domain with the intent to direct consumers looking for Spectrum's association-management services to Lifetime's website offering substantially similar services (Trial Tr. 76:8-77:2, 132:13-133:16).

60.     Incorporation of a mark in an Internet domain name constitutes use "in commerce." *People for Ethical Treatment of Animals v. Doughney,* 263 F.3d 359, 365 (4th Cir. 2001). By directing the Infringing Domain to Lifetime's website for over two years, Defendants also used the Infringing Domain in connection with the promotion of Lifetime's community-association management (Trial Tr. 76:8-77:2; 80:5-19, 86:4-18, 94:10-12). Accordingly, by

registering the Infringing Domain and directing the Infringing Domain to Lifetime's domain where it offered its services, Defendants used Spectrum's Marks in commerce.

61.     Under the ACPA, the Court need only compare the challenged domain name and the Marks when making its "confusingly similar" determination. *See Coca-Cola Co. v. Purdy*, 382 F.3d 774, 783 (8th Cir. 2004). "The inquiry under the ACPA is thus narrower than the traditional multifactor likelihood of confusion test for trademark infringement." *Id*. Accordingly, the fact that confusion about a website's source or sponsorship can be resolved by visiting the website is not relevant to whether the domain name is confusingly similar to the Marks. *See id*.; *Doughney*, 263 F.3d at 366-67.

62.     The Infringing Domain is confusingly similar to the Marks (Ex. P-1 to P-7, P-16; Dkt No. 43-2, Housley Excerpts at p. 26:6-9; Saucedo Excerpts at p. 17:25-18:11; Trial Tr. 93:13-15).

63.     Based on the above evidence, findings, and conclusions, Defendants are liable for violating the ACPA.

**The Safe Harbor Provision Does Not Apply**

64.     The ACPA's "safe harbor," provision provides that "bad faith intent... shall not be found in any case in which the court determines that the person believed and had reasonable grounds to believe that the use of the domain name was a fair use or otherwise lawful." 15 U.S.C. § 1125(d)(l)(B)(ii). Defendants cannot legitimately contend that they believed or had reasonable grounds to believe that the registration and use of the Infringing Domain was a fair use or otherwise lawful when the evidence is undisputed that:

- Defendants obtained the Infringing Domain because it used Spectrum's name and Spectrum offered the same type of HOA management services offered by Lifetime (Dkt. No. 43-2, Housley Excerpts at p. 35:24-36:18; Trial Tr. 74:7-75:5).

- Defendants knew that they did not have any rights to the Marks (Dkt. No. 43-2, Housley Excerpts at pp 35:24-36:18; Trial Tr. 91:12-92:24)

- Defendants recognized that Spectrum was a more well-known name than Lifetime due to its provision of HOA management services for a number of years while Lifetime had just started (Trial Tr. 75:6-14).

- At least one Lifetime partner wanted to purchase the Infringing Domain because he saw value in it and would possibly sell it to Spectrum at a later date (Dkt. No. 43-2, Housley Excerpts at p. 36:7-18).

- At the time Defendants registered the Infringing Domain, Defendants did so with the intent to direct consumers looking for Spectrum's association-management services to Lifetime's website offering substantially similar services (Trial Tr. 76:8-77:2, 132:13-133:16).

- Tuttle admitted that he and Lifetime's actions were done with the intent to harm Spectrum (Trial Tr. 132:13-133:16).

65. Defendants erroneously rely on *Pensacola Motor Sales* to claim the safe harbor provision applies in this case. In *Pensacola*, the Eleventh Circuit reviewed the trial court's order finding that the applicability of the ACPA's Safe Harbor provision was a fact question for the jury. *Pensacola Motor Sales, Inc. v. Eastern Shore Toyota, LLC*, 684 F.3d 1211, 1223 (11th Cir. 2012). In affirming the jury's verdict, the *Pensacola* court simply recognized that sufficient evidence existed to support the jury's finding because there was evidence that Eastern Shore relied on the advice of an internet marketing expert in purchasing the domains at issue. *Id*.

66. But there is no evidence in this case that Defendants relied on any internet marketing expert or that it relied on the advice of any individual. Indeed, the aforementioned findings establish that Defendants did not seek any advice from counsel before purchasing the Infringing Domain (Trial Tr. 76:5-7). Instead, Defendants' brief claims it relied on the "advice" of GoDaddy and that GoDaddy "would not propose they purchase a domain name that was not allowed under the law, but there is no evidence of such advice other than Mr. Tuttle's testimony that the Infringing Domain "was available" (Trial Tr. 138:2-4).

67.     Not only do Defendants not have any evidence of any suggested "advice" or "recommendation" by GoDaddy, the record evidence contradicts the suggestion that GoDaddy provided a recommendation similar to the one relied on by the *Pensacola* defendants. David Housley testified that either he or Mr. Tuttle specifically searched GoDaddy to see if the Infringing Domain was available, not that it was a name suggested or recommended by GoDaddy (Dkt. No. 43-2, Housley Excerpts at p. 28:2-13). Tuttle could only testify that he did not remember doing a specific search for the Infringing Domain (Trial Tr. 117:21-118:2). The idea that Defendants' sought out the Infringing Domain is further supported by Spencer Powell's testimony that Tuttle was interested in purchasing domains that used Spectrum's name (Dkt. No. 43-2, Powell Excerpts at p. 27:8-13, 32:5-14).

68.     Defendants also lack evidence that GoDaddy made any type of representation regarding the legality of the Infringing Domain like the one relied upon in *Pensacola*, which makes sense because GoDaddy would not have any knowledge nor the responsibility to search United States Trademarks or an entity's competitors to determine whether the person or entity purchasing the domain name could legally own it or use it in commerce. Thus, the ACPA's safe harbor provision does not apply to Defendants' actions in this case.

**Statutory Damages**

69.     Although Spectrum could not establish that any of the customers it lost to Lifetime were the result of the Infringing Domain due to Lifetime's failure to preserve records, it does not mean that Spectrum has not been damaged by Defendants' conduct. "A significant purpose of a domain name is to identify the entity that owns the web site." *E. & J. Gallo Winery*, 129 F.Supp. 2d at 1041 (*quoting Panavision Int'l, L.P. v. Toeppen*, 141 F.3d 1316, 1327 (9th Cir. 1998)). "A customer who is unsure about a company's domain name will often guess that the domain name is also the company's name." *Id*. The *Gallo* court recognized that conduct such as Defendants' can damage Spectrum's Marks because "[p]rospective users of plaintiff's services who mistakenly access defendant's website may fail to continue to search for plaintiff's own home page, due to anger, frustration, or the belief that plaintiff's home page does not exist." *Id*. For these and other reasons, a Plaintiff "may elect, at any time before final judgment is rendered by the trial court, to recover, instead of actual damages and profits, an award of statutory damages in the amount of not less than $1,000 and not more than $100,000 per domain name, as the court considers just." 15 U.S.C. § 1117(d).

70.     Courts have discretion in determining how much to award prevailing plaintiffs who elect statutory damages under the ACPA, and the courts take into account whether defendant's registration and/or use of the domain name at issue was done in bad-faith, whether defendant's actions were willful, whether defendant's domain name promotes competing products or services, whether defendant transferred the domain name to avoid liability, and the deterrent effect caused by the award. *See Kiva Kitchen & Bath, Inc. v. Capital Distrib. Inc.,* 319 Fed. Appx. 316, *320-321 (5th Cir. 2009) (affirming award of $100,000 in statutory damages for Defendant's web site that used Plaintiff's mark in connection with identical services provided by

the Plaintiff); *US Green Bldg. Council, Inc. v. Wardell*, No. 3:13-CV-01541-M-BH, 2016 U.S. Dist. LEXIS 89457, *14-15 (N.D. Tex. June 17, 2016) (finding, based on defendant's default, that defendant acted willfully and awarding statutory damages of $100,000); *Mirage Resorts, Inc. v. Cybercom Prods.,* 228 F. Supp. 2d 1141, 1142-43 (D. Nev. 2002) (same); *Graduate Management Admission Council v. Raju,* 267 F. Supp. 2d 505, 511-12 (E.D. Va. 2003) ("Statutory damages are intended not merely for the restitution of profit or reparation of injury, but to deter wrongful conduct."); *Lahoti v. Vericheck, Inc.,* No. C06-1132JLR, 2007 WL 4269791, *14 (W.D. Wash. Dec. 3, 2007) (collecting authorities).

71.     In *Kiva Kitchen*, the Fifth Circuit reviewed a jury's verdict under facts very similar to those in the case. 319 Fed. Appx. at 318-19. Kiva sold high-end kitchen and bath appliances in various Texas cities using different trade names depending on the location of the store. *Id*. at 318. Capital registered eight domains using variations of Kiva's names, three of which (the domains similar to Kiva's Jarrell store in Dallas) were set up to forward to Capital's website – "so that an internet user who typed one of the Jarrell domain names in her browser would be redirected to Capital's website." *Id*. After a six-day jury trial, the jury found Capital liable for violations of the ACPA with respect to all eight domain names and found that the case was "exceptional" because Capital had acted "willfully, maliciously, fraudulently, or deliberately." *Id*.

72.     In post-trial briefing, Kiva requested the trial court award it the greater of statutory damages or an enhancement of the jury's damage award. *Id*. at 318-319. The trial court awarded Kiva $100,000 for each of the Jarrell domains that were forwarded to Capital's web page and $40,000 for each of non-forwarded domains. *Id*. at 320. In affirming the award, the Kiva court recognized the trial court's wide discretion and noted that "the statutory damages

provisions of the ACPA are designed not only to 'compel restitution of profit and reparation of injury' but also 'to discourage wrongful conduct.'" *Id. citing E. & J. Gallo Winery*, 286 F.3d at 278. The *Kiva* court affirmed the trial court's judgment holding that "the maximum statutory award for the [forwarded] domain names was warranted in light of Davis's bad faith intent to divert potential customers to Capital's website and because [Kiva] is a direct competitor of Capital in Dallas." *Id*. at 320.

73. Defendants attempt to differentiate *Kiva* and other maximum award cases by claiming that Defendants offered to turn over the Infringing Domain to Spectrum for no charge. But there is no evidence in the record that Defendants' ever offered to unconditionally turn over the Infringing Domain free of charge, other than attorney argument. Although stated multiple times by opposing counsel, there is no evidence that any such offer was made other than counsel's statements, which are not evidence. *See United States v. Morris*, 568 F.2d 396, 402 (5th Cir. 1978) (statements of counsel are not evidence); *United States v. Watson*, 171 F.3d 695, 701 (D.C. Cir. 1999) (opening statements and closing arguments of counsel are not evidence and that a lawyer's question is not evidence). To extent Defendants' suggest that such an offer was made in the context of settlement, a settlement offer is not unconditional or "free of charge."

74. The above findings of fact demonstrate that Defendants' conduct in registering the Infringing Domain and resolving it to Lifetime's website were similar to the actions of the Capital Defendants in *Kiva*, which were liable for the maximum statutory damages, including:

- At the time Tuttle registered the Infringing Domain, he knew of the existence of Spectrum's domain and the Marks in his role as Spectrum's director of business development (Trial Tr. 20:22-21:1; 23:4-21; 66:13-17);

- Defendants knew that neither Tuttle nor Lifetime had any legitimate intellectual property rights in the Marks (Dkt. No. 43-2, Housley Excerpts at pp 35:24-36:18; Trial Tr. 91:12-92:24);

- Defendants resolved the Infringing Domain to Lifetime's website where it offered the same association-management services provided by Spectrum (Trial Tr. 76:8-77:2, 132:13-133:16); and

- The registration and resolution of the Infringing Domain to Lifetime's website was done for the purpose of redirecting anyone that typed in the Infringing Domain looking for Spectrum to Lifetime's website (Trial Tr. 76:8-77:2, 132:13-133:16).

75.     Defendants' disregard for the submission of inaccurate answers to written discovery also demonstrates Defendants' actions were willful (Ex. P-10, P-13 to P-15; Dkt. No. 43-2, Saucedo Excerpts at p. 23:13-24, 24:10-26:13; Trial Tr. 33:22-36:2; 96:6-98:9; 100:7-102:9). *Lahoti v. Vericheck*, 708 F.Supp. 2d. 1150, 1170-71 (W.D. Wash. 2010).

76.     Tuttle's history of assisting Lifetime in order to compete with Spectrum during the period of his non-compete and evidence that the creation of Lifetime was his idea also evidences Defendants' actions were likely in bad-faith (Dkt. 43-2, Powell Excerpts at p. 12:13-13:19, 15:2-16:23, 42:24-43:25, 52:13-22, 53:1-18, 60:22-61:5; 68:20-69:15; 70:12-71:1).

77.     Furthermore, Defendants admit that they registered the Infringing Domain with the intent to direct consumers looking for Spectrum's association-management services to Lifetime's website offering substantially similar services (Trial Tr. 76:8-77:2, 132:13-133:16).

78.     Accordingly, Defendants' actions were willful and improper and did compete with Spectrum's services, which entitles Spectrum to an award of statutory damages. Therefore, the Court finds that Spectrum is entitled to $100,000.00 in statutory damages.

**Exceptional Case**

79.     Section 1117(a) gives the Court discretion to award reasonable attorneys' fees in "exceptional cases." *See* 15 U.S.C. § 1117(a). The Fifth Circuit characterizes exceptional cases as involving acts that can be called "malicious, fraudulent, deliberate, or willful." *See Kiva*, 319 Fed. Appx. at 321; *Tex. Pig Stands, Inc. v. Hard Rock Café Int'l, Inc*., 951 F.2d 684, 697 (5th Cir. 1992). In *Kiva*, the trial court and jury determined "that Kiva had properly demonstrated that its case was exceptional, in light of defendant's bad faith intent to divert potential Kiva customers to Capital's website. *See Kiva*, 319 Fed. Appx. at 321.

80.     In *Texas Pig Stands*, the Court defined an "exceptional" case as when a party's infringement is malicious, fraudulent, deliberate or willful. The Fifth Circuit has further held the actions by a party must show a high degree of culpability such as bad faith or fraud. *Id.* However, a jury (or in this case, the Court) finding of willfulness does not bind the trial court in determining whether the case is "exceptional." *Id.* In the context of infringement, willful is an act done "willfully" if it is done voluntarily or intentionally and not because of accident or another innocent reason. *Id.*

81.     In this case, the actions of Defendants were certainly willful (i.e., intentional); however, the Court does not believe the actions of Defendants rise to the level of egregious conduct exemplified in *Kiva* and other similar cases. *See Tex. Pig Stands,* 951 F.2d at 697 n.25 (recognizing that some cases have gone as far as to require "very egregious conduct" to constitute an "exceptional" case). Despite Defendants admitting they purchased the Domain, and even recognizing that it could "harm" the Plaintiff theoretically[1], the Court believes Defendants actions do not rise to the level of "exceptional," i.e., "malicious, fraudulent, deliberate, or

willful." *Tex. Pig Stands*, 951 F.2d at 697. Therefore, the Court finds this case is not an exceptional case.

## Injunctive Relief

82.    Section 34(a) of the Lanham Act empowers the courts to grant injunctive relief to prevent the violation of a trademark owner's rights. *See* 15 U.S.C. § 1116(a).

83.    By demonstrating likelihood of confusion, Spectrum demonstrated irreparable injury as a matter of law. *Brennan's, Inc. v. Brennan's Restaurant, LLC*, 360 F.3d 125, 130 (2d Cir. 2004); *Pet Silk, Inc. v. Jackson*, 481 F.Supp. 2d 824, 833 (S.D. Tex. 2007); *Quantum Fitness Corp. v. Quantum Lifestyles Centers, LLC*, 83 F.Supp. 2d 810, 831 (S.D. Tex. 1999).

84.    Spectrum is entitled to permanent injunctive relief against Defendants and that Defendants, its officers, agents, representatives, employees, attorneys, successor, assigns, affiliates, and any persons in active concert or participation of any of them, be enjoined and restrained from: (1) infringing the Marks and (2) registering, using, or trafficking in any domain names that are identical or confusingly similar to the Marks, including but not limited to domain names contain the Marks and domain names containing misspellings of the Marks. The Court will issue a separate order specifically articulating the permanent injunction.

---

[1] Plaintiff's claim that Defendant Tuttle intentionally and maliciously wanted to harm Plaintiff is somewhat taken out of context. Tuttle did say if a customer was redirected to Defendants' website because of the Domain it could be harmful to Spectrum. *See* Trial Tr. 133:1–16. But he did not say he intended to harm Spectrum. *Id.*

## IV.   CONCLUSION

Based on the foregoing, the Court finds that (1) Defendants are liable to Spectrum for registering and using the Infringing Domain in violation of the Anticybersquatting Consumer Protection Act; (2) Spectrum is entitled to a permanent injunction enjoining Defendants from infringing Spectrum's trademarks; (3) and Spectrum is entitled to statutory damages against Defendants jointly and severally in the amount of one hundred thousand dollars ($100,000.00).

**SIGNED** this 20th day of April 2020.

ALAN D ALBRIGHT
UNITED STATES DISTRICT JUDGE